UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOSEPH GUMBS,

                  Plaintiff,

      - against -

Mrs. DYNAN, Assistant Warden of Medical at
MDC-Brooklyn; MEDICAL DEPARTMENT AT
MDC-BROOKLYN et al.; Mr. MAROUSIS-BUSH,
Head of Medical; Mr. ITTAYEM, Assistant Health
Services Administrator; Mr. GEORGY, Assistant
Health Services Administrator; DR. NEWLAND,
Administrative Director; DR. MICHAEL
BORECKY; DR. JUSAYAN; Mr. EDWARDS,
Counselor of Unit I-61; Known and Unknown
Bureau of Prisons staff (All defendants in official
and unofficial capacity),

                  Defendants.
-------------------------------------------------------------X

**<u>MEMORANDUM & ORDER</u>**
11-CV-857 (RRM) (LB)

ROSLYNN R. MAUSKOPF, United States District Judge.

     *Pro se* plaintiff Joseph Gumbs ("Gumbs"), a pre-trial detainee held at the Metropolitan

Detention Center ("MDC") Brooklyn, filed the present action against the Medical Department at

the MDC as well as individual MDC employees pursuant to 42 U.S.C. § 1983, asserting an

Eighth Amendment claim of deliberate indifference to petitioner's medical needs after he

allegedly sustained neck, back and shoulder injuries from a March 2009 fall at the MDC.

(Compl. Addendum (Doc. No. 1) ¶¶ 2, 5.)  Defendants move to dismiss plaintiff's claim pursuant

to Fed. R. Civ. P. 12(b) or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P.

56.  Plaintiff is granted *in forma pauperis* status for purposes of the present action.   For the

reasons set forth herein, defendants' motion is GRANTED with respect to defendant MDC

Medical Department pursuant to Fed. R. Civ. P. 12(b)(1), under the doctrine of sovereign immunity, and with respect to individual defendants pursuant to Fed. R. Civ. P. 56.

## BACKGROUND

Plaintiff arrived at the MDC Brooklyn for pre-trial detention in February 2009. (Defs.' 56.1 Stmt. (Doc. No. 26) ¶ 1.) On March 10, 2009, plaintiff fell in the MDC shower and the "unit officer"[1] called for medical assistance on his behalf. It is alleged that despite further phone calls by unit officers to the Medical Department at the MDC "in the days following" the fall, plaintiff received no medical attention. Plaintiff states that he had no other means of seeking medical attention except through filing sick call slips and written requests,[2] which he did numerous times to no avail. (Compl. Addendum ¶¶ 2-5.) Plaintiff states that because he was suffering extreme pain, he next sought the assistance of defendant Counselor Edwards, the counselor assigned to plaintiff's unit at the MDC, to schedule a medical appointment. Defendant Edwards allegedly told plaintiff that "pre-trial inmates are of no great concern here at MDC-Brooklyn. You'll have to just keep filing requests. Now get out of my office." (*Id*. ¶ 6.)

Plaintiff further alleges that a five-month delay between the March 2009 injury and August 2009 medical visit "prevented the plaintiff from receiving treatment for his injuries and left the plaintiff in a perpetual state of pain." (*Id*. ¶ 7). Medical records show that on August 14, 2009, roughly five months after plaintiff's alleged fall, plaintiff received medical attention from

---

[1] Inmates at the MDC are house in separate units, and the correctional officer assigned to a given unit on a given shift is known as that unit's "unit officer." (Defs.' 56.1 Stmt. ¶ 159.)

[2] As described in the MDC's Admission and Orientation Manual, the primary means for a MDC inmate to obtain medical care is by filling out a sick call sheet and placing it in the sick call box to notify medical personnel that he would like to request an appointment. (*See* Defs.' Reply 56.1 Stmt. (Doc. No. 32) ¶ 40.) If unsuccessful, the Admission and Orientation Manual instructs that an inmate can then submit written requests, commonly known as "copouts" among MDC inmates, to a staff member detailing the need for appropriate medical care. (*Id*. ¶¶ 44-45.)

defendant Dr. Borecky for a six-month follow-up regarding his diabetes.[3]  (Defs.' 56.1 Stmt. ¶ 75; *see* Compl. Addendum ¶ 7.)  Plaintiff reported that he had been experiencing intermittent pain in his left shoulder for the past two and half months but made no mention of neck or back pain.  (Decl. of Layaliza K. Soloveichik ("Soloveichik Decl.") Ex. B (Doc. No. 29, Attach. 1) at 24.)  Dr. Borecky assessed plaintiff's condition as joint pain in the left shoulder region stemming from a 2005 injury, gave plaintiff a new painkiller prescription, and ordered x-ray films to be taken of plaintiff's left shoulder.  (*Id*. at 26; *see* Compl. Addendum ¶ 9.)  Contrary to plaintiff's assertion that "the medical staff delayed an additional three months before actually conducting the x-ray" ordered by Dr. Borecky on August 14, 2009 (Compl. Addendum ¶ 9), medical records show that on August 27, 2009, x-rays were taken of plaintiff's left shoulder and the findings of the radiologist were negative.  (Soloveichik Decl. Ex. B at 28.)

In November 2009, plaintiff filed an Inmate Request for Informal Resolution, otherwise known as a BP-8.  A  BP-8 is the first step in the administrative remedy process.  Plaintiff's BP-8, dated November 12, 2009, only identified pain in his left shoulder and was received by MDC staff on November 24, 2009.  (*Id*. at 29.)  The next day, plaintiff was seen by Dr. Borecky for "progressively worsening pain in the left shoulder."  (*Id*. at 30.)  On this visit, plaintiff reported that the history of trauma date back to 2005 when his left arm was twisted behind his back during the course of an arrest.  (*Id*..)  Dr. Borecky prescribed medication and requested an orthopedic consultation.  A follow-up visit was scheduled for February 2010.  (*Id*. at 32.)  On February 3, 2010, defendant Dr. Jusayan,[4] who was plaintiff's assigned treating physician approximately

---

[3] Plaintiff reported that he was diabetic during the health screening given to newly arrived inmates on February 6, 2009.  The August 14, 2009 visit with Dr. Borecky was a six-month follow-up to plaintiff's February 18, 2009 visit with Dr. Borecky at the MDC medical clinic for diabetic inmates.  (*See* Def. Am. 56.1 Stmt. ¶¶ 66,70.)
[4] Individual defendant Dr. Jusayan has not been served.

from the latter part of 2009 until March 2010 (Defs.' 56.1 Stmt. ¶ 63), examined plaintiff. (Soloveichik Decl. Ex. B at 34.)

Plaintiff alleges that approximately thirteen months after sustaining the injuries, plaintiff was sent to see an orthopedic specialist who ordered an MRI scan to be performed, and that it took an additional three months for plaintiff to receive the MRI. (Compl. Addendum ¶ 10.) Medical records indicate that on February 17, 2010, roughly eleven months after plaintiff's March 2009 injury, plaintiff received an orthopedic consultation at New York downtown Hospital, which recommended an MRI of his left shoulder and a return for a second consultation after the MRI. On the same day, Dr. Jusayan requested an MRI for plaintiff's left shoulder as recommended by the orthopedic clinic, orthopedic surgery as a follow-up after the MRI, and authorized plaintiff to request a two-piece prison jump suit. (Soloveichik Decl. Ex. B at 43-44.) On October 4, 2010, plaintiff underwent an MRI of his left shoulder at New York Downtown hospital. (*Id*. at 49-50.)

The first mention in plaintiff's medical records of lower back pain, but not neck pain, by plaintiff to a member of the MDC medical staff was during a February 2, 2011 visit with defendant Dr. Newland.[5] (*See id*. at 66.) On March 11, 2011, plaintiff received a follow-up consultation with an orthopedic surgeon, who recommended physical therapy. (*Id*. at 71.) the MDC approved the request for said physical therapy on March 18, 2011. (Defs.' 56.1 Stmt. ¶¶ 131-33.) On April 18, 2011, plaintiff was evaluated by an outside rehabilitation specialist for the appropriate course of physical therapy and, upon plaintiff's return to the MDC, defendant Dr. Borecky prescribed medication for plaintiff's left shoulder pain and ordered physical therapy to begin. On the same visit, Dr. Borecky also ordered x-rays of plaintiff's cervical and lumbar

---

[5] Defendant Dr. Newland became plaintiff's assigned treating physician in early 2011. (Defs.' 56.1 Stmt. ¶ 65.)

spine because plaintiff complained of neck and lower pain; this appears to be the first mention of neck pain in plaintiff's medical records. (*See* Soloveichik Decl. Ex. B at 73.)

Plaintiff underwent three sessions of physical therapy in June 2011. (Defs.' 56.1 Stmt. ¶¶ 143-44, 147.) On July 7, 2011, plaintiff was seen by Dr. Newland and requested a stop to the physical therapy because of unbearable pain he experienced on each of the three sessions. Dr. Newland granted plaintiff's request to discontinue physical therapy. (*See* Soloveichik Decl. Ex. B at 86, 88.)

Plaintiff, proceeding *pro se*, filed the present action on February 15, 2011. By Order dated March 3, 2011, the Court construed plaintiff's § 1983 action as one pursuant to *Bivens v. Six Unkown Fed. Marc. Agents*, 403 U.S. 388 (1971) and dismissed the *Bivens* claims against defendant Federal Bureau of Prisons ("BOP") and against individual defendants in their official capacities under the doctrine of sovereign immunity.[6] (March 3, 2011 Order (Doc. No. 3).)

## STANDARD OF REVIEW

"A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) (internal quotation marks omitted). Accordingly the Court construes plaintiff's Complaint with "special solicitude" and interprets it to raise the strongest arguments it suggests. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474-75 (2d Cir. 2006) (quoting *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994)).

---

[6] By the same Order, the Court also dismissed plaintiff's *Bivens* claims against individual defendants Cameron Lindsay, the Warden of MDC; the Assistant Warden of Administrative Remedy at MDC; the Central Office Administrative Remedy Coordinator; and the Regional Office Administrative Remedy Coordinator in their individual capacities pursuant to 28 U.S.C. § 1915A(b) for plaintiff's failure to show these defendants' personal involvement in the alleged deprivation of plaintiff's civil rights. (March 3, 2011 Order at 4-5.)

**Legal Standards Governing Motions Pursuant to Fed. R. Civ. P. 12(b)**

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not contain "'detailed factual allegations,'" but it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rather, the plaintiff's complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570). The determination of whether "a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)).

"The standard for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is 'substantively identical' to the 12(b)(6) standard, except that the plaintiff has the burden of establishing jurisdiction in a 12(b)(1) motion." *S & R Dev. Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 460 (S.D.N.Y. 2008); *see Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir. 2003). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)); *see also Oscar*

*Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193 (2d Cir. 2003) ("Failure of subject matter jurisdiction, of course, is not waivable and may be raised at any time by a party or by the court *sua sponte*.") In considering a motion to dismiss for lack of subject matter jurisdiction, a district court "must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiffs." *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citation omitted). This Court, however, "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits." *Id.* (citations omitted). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys. Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

**Legal Standards Governing Motions Pursuant to Fed. R. Civ. P. 56**

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, a district court must draw all reasonable inferences in favor of the non-moving party. *See id.* at 249 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). Thus, the court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty*

*America v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2007) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)). Any evidence in the record of any material fact from which an inference could be drawn in favor of the non-moving party precludes summary judgment. *See Castle Rock Entm't*, 150 F.3d at 137.

Once the movant has demonstrated that no genuine issue of material fact exists, such that it is entitled to judgment as a matter of law, then "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.'" *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (citing *Anderson*, 477 U.S. at 252; *Matsushita*, 475 U.S. at 586.) Instead, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at 248; *see also Matsushita*, 475 U.S. at 586.

## DISCUSSION

## I. DOCTRINE OF SOVEREIGN IMMUNITY BARS CLAIM AGAINST MDC'S MEDICAL DEPARTMENT

All of plaintiff's claims against the MDC's Medical Department must be dismissed for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). "Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived." *Robinson v. Overeas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir.

1994) (citing *Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 484-86 (1994); *Kentucky v. Graham,* 473 U.S. 159, 166-67 (1985)). As such, the Court hereby dismisses plaintiff's *Bivens* claims against defendant Medical Department at MDC, a federal agency, for a lack of subject matter jurisdiction under the doctrine of sovereign immunity. *See, e.g.*, *Nkansah v. Medical Dept. of MCC*, No. 10 CV 3211, 2011 WL 4073362, at *3 (E.D.N.Y. Sept. 13, 2011) (dismissing claims against the MDC's Medical Department for lack of subject matter jurisdiction); *Demartino v. Zenk*, No. 04 CV 3880(SLT)(LB), 2006 WL 1455456, at *4 (E.D.N.Y. May 25, 2006) (dismissing *Bivens* claims against the MDC's Medical Department under doctrine of sovereign immunity); *cf. Keene Corp. v. United States*, 700 F.2d 836, 845 n.13 (2d Cir. 1983) ("*Bivens* authorizes suits against the responsible federal official, not against the government itself, and *Bivens*-type actions against the United States are . . . routinely dismissed for lack of subject matter jurisdiction." (citations omitted)).

## II.     CLAIMS AGAINST INDIVIDUAL DEFENDANTS ARE NOT ADMINSTRATIVELY EXHAUSTED UNDER THE PLRA AND REQUIRE DISMISSAL

Plaintiff's *Bivens* claims against individual defendants are dismissed for failure to exhaust administrative remedies before bringing said claims in federal court.

### A.  Standard for Administrative Exhaustion Under the PLRA

The Prison Litigation Reform Act ("PLRA") requires inmates to exhaust available administrative remedies before filing actions under federal law challenging prison conditions.[7] 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under

---

[7] The administrative exhaustion requirement of the PLRA exists to give "'prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]' and also creates an administrative record that facilitates judicial review." *Torres v. Anderson*, 674 F. Supp. 2d 394, 397 (E.D.N.Y. 2009) (quoting *Jones v. Bock,* 549 U.S. 199, 204 (2007) (citations omitted); *see Woodford v. Ngo*, 548 U.S. 81, 91 n.2 (2006) (noting the purpose of PLRA's administrative exhaustion requirement to be the prevention of "flood of prisoner litigation in the federal courts").

section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). The PLRA's administrative exhaustion requirement applies equally to *Bivens* claims, including but not limited to *Bivens* claims seeking monetary damages for allegedly negligent medical care that plaintiff received at the MDC. *See Williams v. Metro. Det. Ctr.*, 418 F. Supp. 2d 96, 100-01 (E.D.N.Y. 2005).

Because "[t]he exhaustion requirement covers all claims that an inmate might bring, . . . [i]t follows that failure to exhaust prior to the commencement of a lawsuit requires dismissal of the prisoner's claim." *Torres v. Anderson*, 674 F. Supp. 2d at 397 (citations omitted). "Courts must construe the exhaustion requirement strictly . . . . [A]n inmate can no longer claim that partial exhaustion of administrative remedies is sufficient because prison officials have notice of his claim." *Petrucelli v. Hasty*, 605 F. Supp. 2d 410, 419 (E.D.N.Y. 2009) (citations omitted).

To administratively exhaust claims under the PLRA, inmates at federal correctional facilities must seek formal review of their claims through a multi-step process known as the Administrative Remedy Program. *See* 28 C.F.R. §§ 542.10-542.19; Defs.' 56.1 Stmt. ¶ 178. First, an inmate must present a claim to BOP staff for informal resolution by filing an "Inmate Request for Informal Resolution", also known as a BP-8 form. *See* 28 C.F.R. § 542.13; Defs.' 56.1 Stmt. ¶¶ 182-84. Second, if the issue is not resolved informally or if a waiver for bypassing informal resolution is granted, the inmate must submit to the MDC Warden ("Warden") a "Request for Administrative Remedy", also known as a BP-9 form, within 20 calendar days of

the event forming the basis for the Request. *See* 28 C.F.R. § 542.14(a); Defs.' 56.1 Stmt. ¶¶ 185-87. Third, if not satisfied with the Warden's response to the BP-9, the inmate can then appeal to the appropriate Regional Director by filing a "Regional Administrative Remedy Appeal", also known as a BP-10 form, within 20 calendar days of the date on the Warden's signed response to the BP-9. *See* 28 C.F.R. § 542.15(a); Defs.' 56.1 Stmt. ¶¶ 188-90. Fourth, a negative decision from the Regional Director may be appealed to the office of the General Counsel ("General Counsel" or "Central Office") by filing a "Central Office Administrative Remedy Appeal", or a BP-11 form, within 30 calendar days of the date on Regional Director's signed response to the BP-10. *See* 28 C.F.R. § 542.15(a); Defs.' 56.1 Stmt. ¶ 191. Inmates must use the appropriate form at each stage of administrative remedy appeal, and no claim is considered to have been fully exhausted under the Administrative Remedy Program until it has been considered by the General Counsel's office. *See* 28 C.F.R. §§ 542.14(a), 524.15(b); Defs.' 56.1 Stmt. ¶¶ 200-01.

### B. Plaintiff's Failure to Fully Exhaust Claim of Inadequate Medical Care for Shoulder Pain

Plaintiff initiated but did not complete the administrative remedy process for his *Bivens* claim of inadequate medical care for his left shoulder. This failure to fully exhaust administrative remedies as required by the PLRA requires dismissal of plaintiff's claim regarding medical treatment for his shoulder pain. *See Petrucelli*, 605 F. Supp. 2d at 419 (inmate cannot claim that partial exhaustion of administrative remedies is sufficient to satisfy the PLRA because prison officials have notice of his claim) (citing *Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007)).

In November 2009, plaintiff submitted a BP-8 for the claim of inadequate medical care regarding his left shoulder pain, and thereby initiated the administrative remedy process.

Plaintiff stated on the BP-8 that his painkiller prescription had run out since receiving medical attention from the doctor back in August 2009. Although the BP-8 was dated November 12, 2009, MDC staff's written response on the BP-8 reflects that it was not received until November 24, 2009. (*See* Soloveichik Decl. Ex. B at 29.) On the very next day, November 25, 2009, plaintiff was seen by Dr. Borecky, who issued new painkiller prescriptions for plaintiff, requested an orthopedic consultation, and scheduled a follow-up visit for February 2010. (*Id*. at 30-32.)

If the response to the BP-8 did not resolve the issue and plaintiff wished to file a BP-9, he was required to submit one to the Warden within 20 calendar days of the conduct forming the basis of the BP-9. *See* 28 C.F.R. § 542.14(a); Defs.' 56.1 Stmt. ¶¶ 185-87. On January 26, 2010,[8] plaintiff filed a BP-9, stating that he had run out of pain medication and was still waiting for the orthopedic consultation that Dr. Borecky requested back in November 2009. (*See* Pltf. Resp., Ex. B.) The Warden rejected plaintiff's BP-9 as untimely on January 29, 2010.[9] (Defs.' 56.1 Stmt. ¶ 206.) On February 9, 2010,[10] plaintiff filed a BP-10 with the BOP Regional Director to appeal the Warden's rejection of his BP-9. (*See* Pltf. Resp., Ex. C.) On March 29, 2010, the BOP Regional Director rejected the BP-10 but instructed the Warden to address the

---

[8] Defendants state that according to records from BOP's computerized database SENTRY, plaintiff filed his BP-9 on January 29, 2010, three days after the date reflected on the copy of the BP-9 submitted by plaintiff. (*Compare* Defs.' 56.1 Stmt. ¶ 205 *with* Pltf. Resp., Ex. B.) Because the discrepancy is immaterial to any issue, the Court adopts the earlier filing date in a light more favorable to plaintiff.

[9] An inmate's BP-9, BP-10, or BP-11 can be rejected, respectively, by the Warden, Regional Office, or Central Office without addressing the merits for failure to comply with the Administrative Remedy Program's procedural requirements. In such situations, the inmate would receive a rejection notice explaining the procedural defect and how to correct it if the defect is curable. *See* 28 C.F.R. §§ 542.14(a), (c), 542.15(b), 542.17(b); Defs.' 56.1 Stmt. ¶¶ 196-97.

[10] Defendants state that according to records from BOP's computerized database SENTRY, plaintiff filed his BP-10 on February 16, 2010, one week after the date reflected on the copy of the BP-10 submitted by plaintiff. (*Compare* Defs.' 56.1 Stmt. ¶ 207 *with* Pltf. Resp., Ex. C.) Because the discrepancy is immaterial to any issue, the Court adopts the earlier filing date in a light more favorable to plaintiff.

BP-9's merits if plaintiff resubmitted it.[11]   (Defs.' 56.1 Stmt.   ¶¶ 208-09.)   Instead of resubmitting the BP-9 to the Warden as instructed, however, on March 25, 2010 plaintiff filed a BP-11 to appeal the BOP Regional Director's rejection of the BP-10.  (See Pltf. Resp., Ex. D.) On April 16, 2010, the General Counsel rejected the BP-11 and, like the BOP Regional Director, instructed plaintiff in the rejection notice to resubmit his BP-9 so as to have its merits addressed by the Warden.   (Defs.' 56.1 Stmt.   ¶¶ 212-13.)   Plaintiff never resubmitted his BP-9 to the Warden despite of having been twice instructed to do so.

By abandoning the administrative remedy process that he initiated, plaintiff has failed to fully exhaust administrative remedies regarding his left shoulder.  See Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) (regardless of whether prisoner's informal complaints put the prison officials on notice of his grievance in a substantive sense, to satisfy the PLRA prisoner must also procedurally exhaust available administrative remedies); McDowall v. MDC, No. 08-CV-9329, 2010 WL 649744, at *5 (S.D.N.Y. Feb. 22, 2010) (dismissing plaintiff's claim of deliberate indifference to medical needs for failure to exhaust where plaintiff voluntarily withdrew his BP-9 prior to BOP's decision on its merits).  Administrative exhaustion is not complete until plaintiff resubmits his BP-9 to have its merits addressed by the Warden and fully appeals the Warden's response to the resubmitted BP-9 to both the Regional Director and the General Counsel's office. (Defs.' 56.1 Stmt.  ¶¶ 198-200.)

Plaintiff claims he was prevented from resubmitting his BP-9 to the Warden because defendant Counselor Edwards refused to take the second BP-9 and plaintiff had no other way of resubmitting the BP-9 except through Counselor Edwards. (See Pltf. Resp. at 2-3.)  However,

_____

[11] When the MDC Warden rejects a BP-9 on grounds of procedural defect such as untimeliness and the inmate appeals, the Regional Director and/or General Counsel's Office may reject the appeal on grounds of the same defect or, in the alternative, direct the inmate to resubmit the BP-9 and the Warden to address the BP-9 on its merits upon resubmission. See 28 C.F.R. § 542.17(c); Defs.' 56.1 Stmt. ¶ 198.

such unsworn, conclusory statements about a MDC staff member's obstruction of plaintiff's utilization of the grievance process are insufficient to raise a genuine dispute of material fact. *See Mitchell v. Senkowski*, No. 04-1792, 158 Fed. Appx. 346, at 350 (2d Cir. 2005) ("Appellant's conclusory assertion that prison officials obstructed his utilization of the grievance process is insufficient to raise a genuine dispute of material fact that would defeat summary judgment."). In any case, plaintiff claims only that he attempted to resubmit his BP-9 after being instructed to do so by the Central Office, but does not satisfactorily explain why he failed to resubmit his BP-9 after first being instructed to do so by the Regional Director.[12]   Moreover, plaintiff fails to explain why he could not seek the assistance of other MDC staff members on his unit team for the resubmission of his BP-9.   In his response to defendants' motion, plaintiff mentions that he received assistance from his case manager during the administrative appeal process when the case manager attempted to contact the Regional Director's office.   (*See* Pltf. Resp. at 3.) Furthermore, the record reflects, and plaintiff does not dispute, that MDC inmates who were assigned to defendant Counselor Edwards could also seek assistance from Counselor Gail McMillan, who shared an office with Edwards and often helped inmates assigned to Edwards if they came to the office with questions while Edwards was out of the office.  (Defs.' Reply 56.1 Stmt. (Doc. No. 32) ¶¶ 171-73.)  Thus, plaintiff has neither established that defendant Counselor Edwards was plaintiff's only avenue for BP-9 resubmission, nor explained why he could not have sought the assistance of another counselor or MDC staff member on his unit team to resubmit the BP-9.   Accordingly, plaintiff's *Bivens* claim regarding his left shoulder must be dismissed for failure to fully exhaust administrative remedies under the PLRA.

---

[12] Plaintiff states that after the Regional Director's office instructed him to resubmit his BP-9 to the Warden and plaintiff's "unit team to contact the region", plaintiff's case manager attempted to contact the Regional Director's office but to no avail.  (*See* Pltf. Resp. at 2-3.)  However, this fails to explain why plaintiff did not resubmit a BP-9 to the Warden as instructed by the Regional office before appealing the Region Director's decision to the Central Office.

Plaintiff cites *Martinez v. Weir*, No. 00-CV-1140 (DJS), 2006 WL 2884775 (D. Conn. Oct. 10, 2006) in support of the position that the Court must deny summary judgment to defendants when plaintiff has provided evidence of attempting to exhaust administrative remedies prior to filing his action in court. (*See* Pltf. Resp. at 4.) The facts in *Martinez* are inapposite. In *Martinez*, the court found that "plaintiff has provided evidence that he attempted to exhaust his administrative remedies . . . twice prior to filing" the lawsuit and followed prison officials' instruction to re-file a level 1 grievance after being informed that there was no record of the original level 1 grievance filed by the plaintiff. 2006 WL 2884775, at *5. Here, plaintiff was given two opportunities to refile his BP-9 and failed to avail himself of either one. As such, his claims are barred for failure to exhaust his administrative remedies.

## C. Plaintiff's Failure to Administratively Exhaust Claims of Inadequate Medical Care for Neck and Back Injuries

The only BP forms filed by plaintiff are with regard to medical treatment of his left shoulder but make no mention of neck or back injuries. (*See* Pltf. Resp. (Doc. No. 22), Exs. A-D; Defs.' 56.1 Stmt. ¶¶ 203-11.) Plaintiff does not appear to have filed a BP-9 (Request for Administrative Remedy), let alone a BP-10 (Regional Administrative Remedy Appeal) or a BP-11 (Central Office Administrative Remedy Appeal), to exhaust claims of inadequate medical care for his neck and back injuries. (*See* Defs.' 56.1 Stmt. ¶ 202.) Accordingly, plaintiff's *Bivens* claim of inadequate medical care for his neck and back injuries must be dismissed for failure to exhaust administrative remedies as required by the PLRA. *See, e.g.*, *McDowall v. MDC*, No. 09-CV-0695, 2010 WL 3521879, at *2 (E.D.N.Y. Aug. 31, 2010) (dismissing *pro se* plaintiff inmate's *Bivens* claim for failure to file a BP-9, BP-10, and BP-11). Plainitff's *pro se* status does not change the result. *See, e.g.*, *Houze v. Segarra*, 217 F. Supp. 2d 394, 395-96

(S.D.N.Y. 2002) (dismissing prisoner's complaint for failure to exhaust administrative remedies as required by PLRA after acknowledging that his *pro se* status is generally accorded leniency).

Plaintiff attempts to rely on the same conclusory allegations that certain individuals "conspired and acted in concert with one another as confederates to deny the plaintiff the ability to exhaust his administrative remedy process by refusing to accept the plaintiff's forms, thereby preventing the plaintiff from going anywhere on the administrative ladder." (*See* Compl. Addendum ¶ 14.) However, nowhere does plaintiff explain what prevented him from mentioning neck and back injuries, allegedly all caused by the same fall in the MDC shower, on the same BP-8, BP-9, BP-10, and BP-11 forms that he filed seeking medical treatment for his left shoulder pain. In short, plaintiff has provided no expalnation for his abandonment of the MDC's administrative review process before bringing his claims of inadequate medical care for neck and back injuries in federal court.

## III. *BIVENS* CLAIMS OF INADEQUATE MEDICAL CARE REQUIRE DISMISSAL AS A MATTER OF LAW

Plaintiff's *Bivens* claims of inadequate medical care, besides failing the PLRA's requirement for administrative exhaustion, also warrant dismissal as a matter of law. Plaintiff makes the following allegations against individual defendants: (1) from April 2009 to January 2011, defendants Dynan, Marousis-Bush, Ittayem, Georgy, and Dr. Newland were informed on numerous occasions of plaintiff's medical needs and told "plaintiff that they would get back to him" but never did, (Compl. Addendum ¶ 8); (2) the aforementioned defendants as well as defendant Dr. Borecky were "deliberately indifferent to the plaintiff's medical needs when they would let the plaintiff run out of pain medication" and then tell plaintiff that he needed to buy his own pain medication from the prison commissary, (*id*. ¶ 12); (3) defendant Dr. Borecky refused to perform an MRI scan and other forms of treatment when he saw plaintiff because BOP policy

only allows treatment for one injury at a time, and told plaintiff that "his other injuries would have to wait" while the injury to his shoulder was being treated, (*id.* ¶ 13); (4) plaintiff was in extreme pain but was denied access to the Medical Department when defendant Counselor Edwards, refusing to contact the Medical Department on plaintiff's behalf, allegedly told plaintiff that "pre-trial inmates are of no great concern here at MDC-Brooklyn. You'll have to just keep filing requests. Now get out of my office," (*id.* ¶ 6); (5) defendant Counselor Edwards interfered with the processing of paperwork requesting a medically authorized two-piece jump suit uniform for plaintiff because "he did not believe that a two piece uniform was medically necessary," thereby causing a delay that inflicted extreme pain upon plaintiff while he struggled to get in and out of his regular one-piece jump suit, (*id.* ¶ 11).

### A. Legal Standard Governing *Bivens* Claims of Inadequate Medical Care

Because at the time of the alleged conduct, plaintiff was not a convicted federal prisoner but a pre-trial detainee held in a federal facility, his *Bivens* claims of inadequate medical care should not be assessed under the Eighth amendment as characterized by plaintiff (*see* Compl. Addendum ¶¶ 5-8) but rather, under the Fifth Amendment's Due Process Clause. *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). This distinction is not significant, however, since the analysis of a pre-trial federal detainee's claim of deliberate indifference to his medical needs under the Due Process Clause of the Fifth Amendment is the same as that for a convicted federal inmate under the Eighth Amendment. *Id.*

To establish a claim of inadequate medical care, plaintiff must establish that he had a "serious medical need" and that defendants showed "deliberate indifference" to that need. *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003); *see Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994). The first element of "serious medical need" is an objective one and requires that "the

alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks and citation omitted). Where the basis of an inmate's claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, rather than prison official(s)'s failure to provide medical treatment altogether, the seriousness inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Carpenter*, 316 F.3d at 185-86 (internal quotation marks omitted). In any event, "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).

"Deliberate indifference," the second and subjective element of a *Bivens* claim of inadequate medical care, measures whether prisoner officials acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)). To prove this element, plaintiff must show that "the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result. . . . The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 836-37, 842). A showing of the subjective "deliberate indifference" element "requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Farmer*, 511 U.S. at 826). That is, the "deliberate indifference" prong requires plaintiff to show that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway v. Coughlin*, 37 F.3d at 66 (quoting *Farmer*, 511 U.S. at 837).

**B. Plaintiff Cannot Sufficiently Show Objective Element of "Serious Medical Need"**

The record is clear that plaintiff received on-going treatment for his shoulder pain and then later for his back and neck pains from August 2009 to August 2011. (*See* Defs.' 56.1 Stmt. ¶¶ 74-151; Pltf. Resp. at 7.) The on-going treatment consisted of the following: (1) physical examinations and post-consultation visits with the MDC medical staff, (Defs.' 56.1 Stmt. ¶¶ 75, 90, 104, 111, 113, 121, 125, 135, 137, 148); (2) multiple pain medication prescriptions from August 2009 through June 2011, (*id.* ¶¶ 79, 93, 102, 116, 129, 135, 140); (3) x-rays taken of plaintiff's left shoulder in August 2009 and December 2010, and of his neck and back in May 2011, (*id.* ¶¶ 81, 120, 136); 4) consultations with an orthopedic surgeon at New York Downtown Hospital in Feburary 2010 and March 2011, (*id.* ¶¶ 103, 130); (4) a consultation with a rehabilitation specialist to deteremine the appropriate course of physical therapy in April 201, (*id.* ¶ 134); and 5) three session of physical therapy at a facility outside the MDC in June 2011, (*see id.* ¶¶ 143, 144, 147.)

Given the on-going nature of plaintiff's medical treatment at the MDC, the "serious medical need" inquiry need only focus on the risk of harm faced by plaintiff due to the alleged delays in the provision of medical care by individual defendants. *See Carpenter*, 316 F.3d at 183-84. However, accepting plaintiff's allegations as true and drawing all reasonable inferences in his favor, plaintiff has not satisfied the objective seriousness inquiry. After a combination of repeated medical appointments, analgesic prescriptions, radiology tests and other specialists' consultations, all spanning a two-year period, the ultimate recommendation for defendant's continued course of treatment was that plaintiff undergo physical therapy. (Defs.' 56.1 Stmt. ¶¶

130-31, 134, 144, 147.)  And it is undisputed that plaintiff refused such therapy, even though plaintiff was advised that his physical condition might not improve if he persisted in his refusal. (*Id*. ¶ 150, 154-56.)  Having received two years of ongoing evaluation and treatment, culminating in a plan of treatment that plaintiff rejected, plaintiff cannot plausibly suggest that any harm has been caused by defendants' purported delays.  Indeed, plaintiff does not point to any such harm, but merely makes the circular assertion that the alleged delays in treatment "held up" his treatment.  *See* Comp.l. Add'm ¶9.  Thus, plaintiff fails to plead a sufficiently serious medical need.

### C. Plaintiff Fails to Show Subjective Element of "Deliberate Indifference" by Any Individual Defendant

Even if he has established a plausible and sufficiently serious medical need, Plaintiff has failed to show the second element of his *Bivens* claims, namely that any individual defendant was deliberately indifferent.

### 1. Insufficient Showing of Deliberate Indifference by Individual Defendants Dr. Newland, Dynan, Marousis-Bush, Ittayem, and Georgy for Alleged Promise and Failure to Respond to Plaintiff's Medical Needs

Plaintiff claims that from April 2009 to January 2011, defendants Associate Warden Dynan, Health Services Administrator Georgy, Assistant Health Services Administrator Ittayem, Health Services Administrative Assistant Marousis-Bush, and Dr. Newland were informed on numerous occasions of plaintiff's medical needs but, despite promising plaintiff that they would address the issue and get back to him, failed to do so.  (*See* Compl. Addendum ¶ 8.)

As an initial matter, conclusory allegations that defendants were aware of plaintiff's medical needs and chronic pain but failed to respond are generally not sufficient proof of defendants' deliberate indifference and cannot survive a Rule 12(b)(6) motion to dismiss.  *See,*

*e.g.*, *Adekoya v. Holder*, 751 F. Supp. 2d 688, 691, 697 (S.D.N.Y. 2010) (finding conclusory allegations that medical staff defendants were aware of plaintiff's medical needs and failed to provide adequate care to be insufficient in defeating a motion to dismiss *Bivens* claim of inadequate medical care).

Even assuming *arguendo* that plaintiff's conclusory allegations are true, Dr. Newland, could not have shown deliberate indifference to plaintiff's serious medical needs by failing to respond to plaintiff's various verbal inquiries from April 2009 to January 2011, since he was not working at the MDC during this time. Defendant Dr. Newland left the MDC in March 2009 for another job position within the BOP and did not return to the MDC's medical staff until January 2011. (Defs.' 56.1 Stmt. ¶¶ 35-37.)

Claims against defendants Dynan, Georgy, and Marousis-Bush fare no better. *See*, *e.g.*, As the Court previously explained, the "serious medical need" inquiry, and by inference the corresponding "deliberative indifference" inquiry, needs to focus only on the alleged *delays* in plaintiff's on-going medical treatment. Plaintiff has identified two such delays: 1) the five-month delay between sustaining injury and receiving medical attention in August 2009, and 2) the three-month delay between the August 2009 medical appointment and November 2009 referral for an orthopedic consultation. The record reflects, and plaintiff does not dispute, that defendants Dynan, Georgy, and Marousis-Bush did not join the MDC staff until November 2010, January 2010, and April 2010 respectively. (*See* Defs.' Reply 56.1 Stmt. ¶¶ 13, 22, 32.) Plaintiff does not explain what role did any individual defendant play in causing the two alleged delays, which took place in 2009, in plaintiff's medical treatment. As such, these defendants cannot be said to have been deliberately indifferent when they did not participate in the treatment of which plaintiff complains. *See Gray v. Metropolitan Detention Center*, No. 09–CV–

4520(KAM)(LB), 2011 WL 2847430, at *1, 11 (E.D.N.Y. July 15, 2011) (conclusory allegations that plaintiff reported his medical situation to individual defendants without establishing that individual defendants had any role in plaintiff's medical care did not establish that defendants acted with deliberate indifference to plaintiff's serious medical needs).

Moreover, Marousis-Bush and defendant Assistant Health Services Administrator Ittayem performed administrative duties at the MDC's Medical Department, including tasks such as budgeting and supervising responses to administrative remedy requests regarding medical care. They are not MDC medical providers and do not provide medical care to inmates. (*See* Defs.' 56.1 Stmt. ¶¶ 28-29.) And plaintiff fails to explain what role they could have played in causing or expediting delays in plaintiff's medical treatment. Thus, from the facts alleged, they cannot be said plausibly to have been deliberately indifferent to plaintiff's medical needs.

**2. Insufficient Showing of Deliberate Indifference by Individual Defendants Dr. Borecky, Dr. Newland, Dynan, Marousis-Bush, Ittayem, and Georgy for Allegedly Telling Plaintiff to Purchase Pain Medication from Commissary**

Plaintiff claims that defendants Dr. Borecky, Dr. Newland, Dynan, Marousis-Bush, Ittayem, and Georgy were "deliberately indifferent to the plaintiff's medical needs when they would let the plaintiff run out of pain medication" and then tell plaintiff that he needed to buy his own pain medication from the prison commissary. (*See* Compl. Addendum ¶ 12.) According to plaintiff, this caused him to "suffer unbearably" because BOP policy limited medication purchases from the commissary to one bottle per order and no more than once every two weeks,[13] which did not meet plaintiff's dosage requirements for pain medication. (*See* Compl.

---

[13] The quantity limitation to MDC inmates' purchases of over-the-counter analgesics from the prison commissar, it is in place to protect the health of inmates, presumably from potential consequences like medication overdoses. (*See* Defs.' 56.1 Stmt. ¶ 51; Decl. of Michael Borecky ("Borecky Decl.") (Doc. No. 28, Attach. 6) ¶ 5.)

Addendum ¶ 12.)  Plaintiff's claim, in essence, appears to be that individual defendants should have increased the dosage and/or duration of his prescriptions.

The aforementioned individual defendants' alleged advice for plaintiff to purchase mediation from the commissary once his prescription medication ran out, even if true, does not show that they "knew of and disregarded an excessive risk" to plaintiff's health.  *Hathaway*, 37 F.3d at 67.   To the extent that plaintiff is challenging the dosage level or duration of his prescription pain medication as insufficient, his claim of deliberate indifference by individual defendants fails because plaintiff does not allege that any individual defendant prescribed medication to plaintiff with the requisite culpable state of mind.  *See Lopez v. City of New York*, No. 05 Civ. 10321(NRB), 2009 WL 229956, at *11 (S.D.N.Y. Jan. 30, 2009) (dismissing inmate's challenge of prescription dose level's adequacy for lack of medical testimony supporting such challenge and for lack of evidence that prison doctors prescribed said dosage with requisite awareness and disregard of excessive risk to inmate safety).

As an initial matter, plaintiff's claim against defendants Dynan, Marousis-Bush, Ittayem, and Georgy must be dismissed because they are not MDC medical providers and have no control over the dosage level and duration of medical prescriptions to inmates.   (*See* Defs.' 56.1 Stmt. ¶¶ 15, 24, 29, 33.)  As for defendant Dr. Borecky, who ceased being plaintiff's assigned treating physician after August 2009, the only pain medication that Dr. Borecky prescribed and could have been deliberately indifferent to plaintiff for its dosage level or prescribed duration was the acetaminophen prescribed on August 14, 2009 (*see* Soloveichik Decl. Ex. B at 25-26), when Dr.

Borecky was presumably still plaintiff's assigned treating physician.[14]  *See Cuoco*, 222 F.3d at 11 (prison doctor's refusal to intervene in the medical treatment of a patient not assigned to him, despite ability to prescribe medication and inmate's demand for prescription, was objectively reasonable as matter of law).  The August 14, 2009 acetaminophen prescription was for fifteen days, putting the earliest time where plaintiff could have run out of pain medication at late August or early September 2009.  By this time, however, Dr. Borecky was no longer plaintiff's assigned treating physician and therefore, as a matter of law, could no longer be liable for deliberate indifference toward plaintiff's medical needs.

Similarly, remaining defendant Dr. Newland could not be capable of deliberate indifference toward plaintiff until he became plaintiff's assigned treating physician upon his January 2011 arrival at the MDC.  Dr. Newland first saw plaintiff on a medical visit on February 2, 2011, issued plaintiff pain medication prescription on that visit, and again issued another prescription following a June 2011 visit, with each prescription lasting for a duration of six months.  (*See* Defs.' 56.1 Stmt. ¶¶ 125, 129, 137, 140.)  Filed on February 15, 2011, plaintiff's complaint about Dr. Newland's failure to intervene after plaintiff ran out of pain medications is simply contradictory to plaintiff's medical records.

For the reasons above, plaintiff has failed to show that any individual defendant was deliberately indifferent to the plaintiff's medical needs by directing him to buy his own pain medication from the prison commissary after he ran out of prescribed pain medication.

---

[14] Defendant Dr. Borecky was plaintiff's assigned treating physician only from February until sometime in August 2009, when Dr. Jusayan took over the responsibility.  Upon Dr. Jusayan's departure from the MDC around March 2010, Dr. Borecky along with other medical providers filled in at medical appointments for inmates like plaintiff who had Dr. Jusayan as their assigned treating physician.  In early 2011, defendant Dr. Newland became plaintiff's assigned treating physician when he joined the MDC medical staff.  (*See* Defs.' 56.1 Stmt. ¶¶ 62-65.)  In light of this timeline, the only pain medication for which Dr. Borecky could be potentially liable for the dosage level and prescribed duration is the acetaminophen oral tablets prescribed on August 14, 2009, when Dr. Borecky was presumably still plaintiff's assigned treating physician.  (*See* Soloveichik Decl. Ex. B at 25-26.)

**3. Insufficient Showing of Deliberate Indifference by Individual Defendant Dr. Borecky for Allegedly Refusing to Treat More than One Injury at a Time**

Plaintiff claims that defendant Dr. Borecky refused to perform an MRI scan or other forms of treatment when he saw plaintiff because BOP policy only allows treatment for one injury at a time, and told plaintiff that "his other injuries would have to wait" while his shoulder injury was being treated. (*See* Compl. Addendum ¶ 13.) Contrary to this assertion, plaintiff's medical records show that on each of his visits with Dr. Borecky, he was treated and/or prescribed medication for other ailment(s) in addition to his shoulder injury. For example, Dr. Borecky treated plaintiff for chronic conditions like diabetes, esophageal reflux, and hyperlipidemia in addition to shoulder pain during both the August 14, 2009 visit and the November 16, 2010 visit. (Soloveichik Decl. Ex. B at 25, 55.) On April 18, 2011, Dr. Borecky treated plaintiff for shoulder, neck, and lower back pains. (*Id*. at 73.)

Plaintiff's allegation regarding Dr. Borecky's failure to prescribe an MRI scan is without merit as well. The MRI of plaintiff's shoulder that Dr. Jusayan requested in February 2010 was, as a matter of fact, recommended by the very orthopedic specialist with whom Dr. Borecky requested a consultation for plaintiff in November 2009. (*See* Defs.' 56.1 Stmt. ¶¶ 94. 103-05.) Plaintiff's claim, in essence, appears to be the following: Dr. Borecky's failure to *immediately* request an MRI scan when he treated plaintiff in August 2009 and then again in November 2009 constituted deliberate indifference to plaintiff's medical needs. However, a medical judgment is not deliberate indifference just because it is not the inmate's preferred course of treatment. "Whether to order an MRI or similar diagnostic treatments is a classic example of a matter for medical judgment,' and where the treatment provided is responsive to the prisoner's condition, . . . the fact that a prisoner might prefer different treatment does not give rise to" a Constitutional violation. *Victor v. Milicevic*, 361 Fed. Appx. 212, 215 (2d Cir. 2010) (internal quotation marks

and citations omitted). Medical records demonstrate that Dr. Borecky took specific actions, in addition to prescribing medications, as a response to plaintiff's complaints of shoulder pain. In fact, following the August 14, 2009 visit, Dr. Borecky ordered x-rays to be taken of plaintiff's shoulder, and said order was executed roughly two weeks later. (Soloveichik Decl. Ex. B at 26, 28.) Also, following the November 25, 2009 visit, Dr. Borecky requested an orthopedic consultation that eventually led to an MRI scan of plaintiff's shoulder. (*See id*. at 32.)

For these reasons, plaintiff has failed to show that defendant Dr. Borecky was deliberately indifferent to the plaintiff's medical needs by refusing to perform an MRI scan and allegedly telling plaintiff that "his other injuries would have to wait" while the injury to his shoulder was being treated.

### 4. **Insufficient Showing of Deliberate Indifference by Individual Defendant Edwards for Allegedly Refusing to Contact Medical Department on Plaintiff's Behalf**

Plaintiff's first allegation against defendant Edwards is that at some point between his March 2009 injury and August 2009 treatment, Edwards refused to help plaintiff in getting medical attention, instead telling him "[y]ou'll have to just keep filing requests" because pre-trial MDC inmates' medical needs were not important. (*See* Compl. Addendum ¶ 6.)

However, the record reflects that the undisputed primary means for an inmate to obtain medical care is not through his assigned counselor, but by filling out a sick call sheet and placing it in the sick call box to notify medical personnel that he would like to request an appointment, as described in the Admission and Orientation Manual. (*See* Defs.' Reply 56.1 Stmt. ¶ 40.) An inmate can obtain blank sick call sheets from any member of his unit team, such as his counselor, case manager, or unit manager. (*See id*. ¶ 41.) Under the "Emergency Sick Calls" heading of the Admission and Orientation Manual, inmates are advised that if they require medical attention

after regular sick call hours or on weekends and holidays, they could ask the unit officer or work detail supervisor to contact health services, which would in turn honor the request if the physician feels immediate medical attention is necessary in a particular inmate's case. (*See id.* ¶ 42.) If unsuccessful, the Admission and Orientation Manual instructs that an inmate can then submit written requests to a staff member detailing the need for appropriate medical care and, if still dissatisfied, initiate the aforementioned multi-step Administrative Remedy Program. (*See id.* ¶¶ 44-46.)

Drawing all reasonable inferences in plaintiff's favor, plaintiff's allegations against defendant Edwards fail to establish that Edwards was deliberately indifferent. Edwards' alleged refusal to help plaintiff secure a medical appointment and instruction for plaintiff to "keep filing requests" (Compl. Addendum ¶ 11), while less than courteous in tone, does not deviate from the procedures for inmates seeking medical attention as set forth in the Admission and Orientation Manual for MDC inmates. Such compliance with MDC procedures does not constitute deliberate indifference on Edwards' part. *See Demartino*, 2006 WL 1455456, at *8 (allegation that MDC unit manager did nothing to help plaintiff inmate get medical attention and told plaintiff to be patient because understaffed MDC medical department "could take as long as they want" fails to establish unit manager was aware of and ignored substantial risk of serious harm to plaintiff).

Plaintiff's BP-8 filing initiated the administrative remedy process in November 2009 seeking resolution for his shoulder pain, implying that he received a copy of the Admission and Orientation Manual or, at the very least, was familiar with the Manual's procedures for MDC inmates seeking medical attention. (*See* Defs.' Reply 56.1 Stmt. ¶ 203.) Furthermore, plaintiff does not allege that defendant Edwards interfered with plaintiff's ability to utilize these MDC

procedures by, for example, denying plaintiff the use of blank sick call sheets to fill out additional medical appointment requests, or refusing to make emergency sick calls on plaintiff's behalf to health services after regular sick call hours or on weekends and holidays.

In short, defendant Edwards' alleged refusal to help plaintiff secure a medical appointment and instruction for plaintiff to "keep filing requests" did not constitute deliberate indifference, as it was in compliance with standard procedures for MDC inmates seeking medical attention.

5. **Claim Against Individual Defendant Edwards for Causing Delay in Issuance of Two-Piece Prison Jumpsuit Uniform Sufficiently Shows Deliberates Indifference But Requires Dismissal for Lack of Administrative Exhaustion**

Plaintiff's second allegation against defendant Edwards is that he knowingly caused a delay in the processing of paperwork requesting a medically authorized two-piece prison jumpsuit uniform for plaintiff, thereby inflicting extreme pain upon plaintiff while he struggled to get in and out of his regular one-piece jump suit. (Compl. Addendum ¶ 11.)

To obtain a two-piece jumpsuit, an inmate must obtain a medical authorization and bring it to a counselor; the counselor, in turn, will sign and date a Laundry Clothing Issue and Exchange Form, staple the medical authorization to said Form, and submit the Form to the laundry unit, which will distribute the new uniform to the inmate. (Defs.' 56.1 Stmt. ¶¶ 168-69.) Plaintiff claims that he did not receive his medically authorized two-piece jumpsuit until approximately seven weeks after the authorization was issued on February 17, 2010, which subjected him to extreme pain in the interim and forced him to defecate in his clothing at times, and that defendant Counselor Edwards knowingly caused this delay.

However, it is undisputed that at the time of events giving rise to the present action, Edwards shared an office with Counselor Gail McMillan, and the two counselors were in the

habit of helping inmates on each other's caseload depending on who was in the office when an inmate came with a question. (Defs.' Reply 56.1 Stmt. ¶ 171.) Medical records and Counselor McMillan's affidavit reflect that on April 5, 2010, plaintiff brought the medical authorization for a two-piece jumpsuit dated February 17, 2010 to the shared office of Counselors McMillan and Edwards. Because plaintiff's assigned counselor, defendant Edwards, was not in the office at the time, Counselor McMillan helped plaintiff. (*Id*. ¶¶ 172-73.) Counselor McMillan states in her affidavit that, consistent with her practice in the past, she completed a Laundry Clothing Issue and Exchange Form that same day, and stapled a copy of plaintiff's medical authorization to the Form. (*Id*. ¶¶ 170, 174; *see* McMillan Decl. (Doc. No. 28, Attach. 8) ¶¶ 11, 12 & Ex. 1.) Plaintiff admits that he received the two-piece jumpsuit shortly after Counselor McMillan's processing of the authorization on April 5, 2010. (*See* Compl. Addendum ¶ 11.)[15]

## IV.  PLAINTIFF'S REQUEST FOR DISCOVERY IS DENIED

Plaintiff requests the Court to deny defendants' pre-discovery motion and allow plaintiff to conduct discovery in order to oppose the motion. (*See* Pltf. Resp. at 10-11.) The Court interprets plaintiff's request as an application for discovery under Fed. R. Civ. P. 56(d).[16] A party resisting summary judgment and requesting Rule 56(d) discovery must submit an affidavit showing "(1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Alcantara v. City of New York*, 646 F. Supp. 2d 449, 463 (S.D.N.Y. 2009) (citations omitted).

---

[15] Moreover, plaintiff has not administratively exhausted his claim, as required by the PLRA, against defendant Edwards regarding this particular claim. Said defect is ground for dismissal, without prejudice, of the claim against Edwards regarding his allegedly knowing delay in processing plaintiff's medically authorization for a two-piece jumpsuit. *See, e.g.*, *Henry v. Nassau Univ. Med. Ctr.*, No. 06-CV-6867 (JS)(ETB), 2008 WL 638246, at *3 (S.D.N.Y. July 22, 2011) (dismissing inmate's deliberate indifference claim without prejudice for failure to exhaust administrative remedies as required by PLRA).
[16] Fed. R. Civ. P. 56(d) was formerly Fed. R. Civ. P. 56(f), which plaintiff cites in his response to defendants' motion, (*see* Pltf. Resp. at 10-11), before being recodified in 2010 with no substantial changes.

As an initial matter, plaintiff has failed to submit such an affidavit, despite having been served with a Notice to *Pro Se* Litigant Opposing Motion To Dismiss or Motion For Summary Judgment, which attached Fed. R. Civ. P. 56(d) and set forth the requirement for an affidavit supporting a Rule 56(d) discovery request. (*See* September 2, 2011 Letter to Plaintiff (Doc. No. 19).) Plaintiff's failure to submit an affidavit under Rule 56(d) is sufficient grounds for denying his discovery request. *See, e.g.*, *Capital Partners v. Alternative Constr. Tech.*, 638 F. Supp. 2d 360 (S.D.N.Y. 2009) (citing *Di Benedetto v. Pan Am World Service, Inc.*, 359 F.3d 627, 630 (2d Cir. 2004)).

Even setting aside plaintiff's failure to submit an affidavit, he has not described any of the following four categories of information requisite to this Court's permission to conduct Rule 56(d) discovery: the specific facts he seeks to discover, how he expects these facts to create a genuine issue of material fact, what efforts he has made to obtain these facts, and why these efforts failed. *See Alcantara*, 646 F. Supp. 2d at 463. On the contrary, plaintiff only states in general, conclusory terms that "plaintiff has not been given his medical records" and "needs to conduct discovery to obtain factual information to further oppose defendants['] motion." (Pltf. Resp. at 11.) However, "a bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f) [now recodified as Rule 56(d)]." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994) (internal quotation makrs and citations omitted); *accord Aguiar v. Lindsay*, Nos. 07-CV-3104 (DLI)(LB), 07-CV-3140 (DLI)(LB), 07-CV-3141 (DLI)(LB), 08-CV-03311 (DLI)(LB), 2010 WL 1286217, at *7 (E.D.N.Y. Mar. 31, 2010). For the reasons above, the Court denies plaintiff's rule 56(d) application for discovery.

## <u>CONCLUSION</u>

For the reasons stated herein, defendants' motion to dismiss or in the alternative for summary judgment (Doc. No. 24) is granted, and this action is dismissed. The Clerk of Court shall enter judgment accordingly, mail a copy of this Memorandum and Order to plaintiff *pro se*, and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated: Brooklyn, New York
       August 26, 2012

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge